

**ARCCA, INCORPORATED**
Three Gateway Center
401 Liberty Avenue, Suite 1325
Pittsburgh, PA 15222
**PHONE:** 866-502-7222 **FAX:** 412-566-6798
www.arcca.com

December 11, 2020

James Walker, Esquire
Jim Walker and Associates PLLC
4925 Greenville Avenue
Suite 200
Dallas, TX 75206

  Re: *Manley, Paul, Individually and as a § Representative of the Estate of § Harold Manley Jr. v. FCA US LLC*
    *United States District Court for the Eastern District of Texas, Sherman Division*
    ARCCA File No.: 5870-Manley

Dear Mr. Walker:

Thank you for the opportunity to participate in the above-referenced matter. Your firm retained ARCCA, Incorporated to evaluate the subject incident in relation to Harold Manley Jr. This analysis is based on information currently available to ARCCA and is only to be issued in its entirety. However, ARCCA reserves the right to supplement or revise this report if additional information becomes available.

The opinions in this matter will be based on my analysis of the materials available using methodologies generally accepted in the scientific and biomedical communities.[1,2,3] The opinions are also based on my education, background, knowledge, and experience in the fields of accident reconstruction, human kinematics, and biomechanics. I have studied and taught at the University level the very principles used in my work in this matter. I am uniquely trained in the scientific methodologies required to evaluate mechanisms of injury to the human body during both inertial and impact loading. I obtained a Doctor of Philosophy (Ph.D.) degree in Bioengineering from the University of Pittsburgh, a Master of Science degree in Bioengineering from the University of Pittsburgh, and a Bachelor of Science degree in Mechanical Engineering with a minor in Biomedical Engineering from Carnegie Mellon University. I have completed advanced coursework in the fields of musculoskeletal biomechanics, kinematics, injury tolerance, biomaterials, physics, statics and dynamics, physiology and anatomy, impact mechanics, and materials engineering. I am also a member of the Society of Automotive Engineers. While at the University of Pittsburgh, I assisted in teaching courses to graduate students related to Biomedical Engineering. While at ARCCA, I continue to conduct technical lectures dealing with the causation and prevention of biomechanical failures during both inertial and impact loading.

I have conducted studies to evaluate the kinematics and biomechanics of the human body during various events and circumstances. My testing and research have been performed with both anthropomorphic test devices and human subjects. As such, I am very familiar with the theory and application of human tolerance to inertial and impact loading, as well as the techniques and processes for evaluating human kinematics and biomechanical failure potential. I have

---

[1] Nahum, A., Gomez M. (1994). Injury Reconstruction: The Biomechanical Analysis of Accidental Injury, (SAE 940568). Warrendale, PA, Society of Automotive Engineers.
[2] Robbins, D. H., et al., (1983) Biomechanical Accident Investigation Methodology Using Analytic Techniques, (SAE 831609). Warrendale, PA, Society of Automotive Engineers.
[3] Walz, F.H., and Muser, M.H., (2000). "Biomechanical Assessment of Soft Tissue Cervical Spine Disorders and Expert Opinion in Low Speed Collisions." Accident Analysis and Prevention 32: 161-165.

**Exhibit A**

James Walker, Esquire
December 11, 2020
Page 2



participated in the development and testing of seating and restraint systems with both anthropomorphic test devices and human subjects. I am therefore very familiar with the theory and application of restraint systems and their ability to protect occupants from inertial and impact loading, as well as the techniques and processes for evaluating their performance characteristics.

**Incident Description:**

According to the Texas Peace Officer's Crash Report and other available documents, on February 16, 2017, at approximately 11:23 a.m., Mr. Harold Manley Jr. was the front passenger of a 2011 Jeep Grand Cherokee that was traveling northbound on Highway 121 near the intersection of Old Ector Road in Bonham, Texas. Mr. Paul Manley was the driver of the subject Jeep. Mr. Christian Hernandez-Solis was the driver of a 2011 Chevrolet Silverado that was traveling in front of the subject Jeep. Mr. Jesus Hernandez Solis, Ms. Maria Delsoccor Hernandez, and Ms. Maria Hernandez were passengers within the incident Chevrolet. According to the Crash Report, as the incident Chevrolet slowed for an upcoming turn, contact occurred between the front of the subject Jeep and the rear of the incident Chevrolet. The subject Jeep subsequently left the roadway to the right, contacting a sign and embankment, and becoming airborne *"flipping end over end."*



**Figure 1. Texas Peace Officer's Crash Report Field Diagram (not to scale).**

James Walker, Esquire
December 11, 2020
Page 3



**Materials Reviewed:**

In the course of my analysis, I reviewed the following materials:

- Texas Peace Officer's Crash Report [February 16, 2017]
- Eighty-three (83) reproductions of photographs of the incident scene taken by Bonham Police Department
- Eighty-eight (88) reproductions of photographs of the incident scene via Bonham Police Department drone
- Bonham Police Department bodycam and dashcam videos
- Seventy-two (72) reproductions of photographs of the 2011 Jeep Grand Cherokee
- Eighty-six (86) reproductions of photographs of the 2011 Chevrolet Silverado
- Twenty-one (21) reproductions of photographs of Harold Manley's injuries
- Estimate of Record for the subject 2011 Jeep Grand Cherokee [February 23, 2017]
- Estimate of Record for the incident 2011 Chevrolet Silverado [February 24, 2017]
- Report graphic incident summary
- Video recorded interview of Paul Manley
- Audio recorded interview of Christian Hernandez [February 24, 2017]
- Medical records and reports pertaining to Harold Manley
- Collin County Medical Examiner's Inspection Report and Narrative pertaining to Harold Manley [February 17, 2017]
- FCA US LLC's Initial Disclosures [May 3, 2019]
- Joint Rule 26(f) Attorney Conference Report [May 7, 2019]
- Plaintiffs' First Amended Complaint [June 14, 2019]
- FCA US LLC's Response to Plaintiffs' First Set of Requests for Production [July 26, 2019]
- Animation
- ARCCA Inc. Inspection of the subject 2011 Jeep Grand Cherokee [August 20, 2020]
- Crash Data Retrieval file for the subject 2011 Jeep Grand Cherokee [May 2, 2019]
- Discovery documents
- Vinlink data sheet for the subject 2011 Jeep Grand Cherokee
- Expert AutoStats data sheets for a 2011 Jeep Grand Cherokee
- Vinlink data sheet for the incident 2011 Chevrolet Silverado
- Expert AutoStats data sheets for a 2011 Chevrolet Silverado
- Consultation with Dr. Daniel Wolfe, Ph.D., ACTAR, Dr. Michael Stichter, Ph.D., P.E., CFEI, CVFI, and Mr. Michael Markushewski
- Publicly available literature, including, but not limited to, the documents cited within the report, learned treatises, text books, and scientific standards

James Walker, Esquire
December 11, 2020
Page 4



**Biomechanical Analysis:**

The biomechanical analysis that will be performed in the context of this incident utilizes a sound scientific methodology that has been subjected to peer-review and publication and has been generally-accepted by the scientific community.[4,5,6] The analysis consists of the following steps:

1. From the available medical records and other documents, define and describe the injuries that Mr. Manley sustained as a result of the subject incident and identify the mechanisms required to cause such injuries;

2. Determine Mr. Manley's kinematic response (movement) within the vehicle as a result of the subject incident;

3. Determine how the vehicle and occupant kinematics in the incident created the mechanisms that caused Mr. Manley's injuries and determine the factors that contributed to or enhanced the injury mechanisms;

4. Evaluate Mr. Manley's kinematics and the absence or presence of injury mechanisms associated with alternative design seating/restraint systems.

The outlined methodology (referred to as a failure analysis) enables a systematic examination of the subject incident by beginning at the undesired consequence.[7] The fundamental mechanical process, or injury mechanism, responsible for each injury is defined. The subject incident is then broken down according to Harold Manley's response to evaluate the responsible injury mechanisms. It is important to note that this biomedical investigation is not intended to offer any medical diagnoses. There is also no intention to offer rebuttal to existing diagnoses. Rather, the forensic evidence and biomedical research were used to identify the specific scenario responsible for causing Harold Manley's injuries.

**Findings:**

*Injuries:*

According to the available medical records, and other available documents, Harold Manley was diagnosed with the following injuries as a result of the subject incident:

*External (Figure 2):*

- 3 inch linear laceration coronally arranged and extending from crown of scalp into right parietal scalp
- Cluster of abrasions to right forehead
- Left periorbital ecchymosis
- Brain matter coming from nose
- Multiple ecchymoses to bilateral forearms

---

[4] Walz, F.H., and Muser, M.H., (2000). "Biomechanical Assessment of Soft Tissue Cervical Spine Disorders and Expert Opinion in Low Speed Collisions." Accident Analysis and Prevention 32: 161-165.
[5] Nahum, A., Gomez M. (1994). Injury Reconstruction: The Biomechanical Analysis of Accidental Injury, (SAE 940568). Warrendale, PA, Society of Automotive Engineers
[6] Robbins, D.H., et al., (1983) Biomechanical Accident Investigation Methodology Using Analytic Techniques, (SAE 831609). Warrendale, PA, Society of Automotive Engineers.
[7] Recht, J.L. (1974). Introduction to Fault Tree Analysis, (SAE 740432). Society of Automotive Engineers.

James Walker, Esquire
December 11, 2020
Page 5



*Internal:*

- Open basal skull fracture (per EMS)
- Right arm fracture (per EMS)
- Compound fracture of medial left ankle

According to the Collin County medical examiner's Inspection Report and narratives, Harold Manley sustained a 3 inch laceration extending from the crown of his scalp into the right parietal region and a compound fracture of his medial left ankle. He also sustained a cluster of abrasions to his right forehead, left periorbital ecchymosis and ecchymoses to his bilateral forearms. The cause of death was listed as blunt force injuries with hypertensive and arteriosclerotic cardiovascular disease.

According to the Bonham Fire Department EMS report, Harold Manley additionally sustained a basal skull fracture with blood/brain matter coming from his nose and mouth, as well as a right arm fracture.



**Figure 2. Injury diagram for Harold Manley.**

James Walker, Esquire
December 11, 2020
Page 6



The Texas Peace Officer's Crash Report indicates that Harold Manley was the front passenger in the subject Jeep Grand Cherokee. The Crash Report also indicates that, after the subject incident, witnesses attempted to assist Harold Manley and when they opened his door, he fell out onto the ground.

*Subject Jeep Grand Cherokee Inspection:*

The subject 2011 Jeep Grand Cherokee was inspected by ARCCA, Inc. on August 20, 2020 in Leonard, Texas. The right front seat that was occupied by Mr. Manley at the time of the incident failed and collapsed rearward. There was no apparent intrusion into the right front occupant space. Incident scene photographs demonstrate that the right front head restraint had become disengaged from the right front seatback. The right front head restraint was found re-engaged in the right front seatback during ARCCA, Inc.'s inspection. The inboard and outboard head restraint tubes were both deformed rearward, as were the adjustment tubes in the seatback. Scuff marks were visible on the front of the right front seatback, as well as the right rear seatback (Figure 4). A dynamic melted abrasion mark was visible along the top inboard part of the center rear folding armrest/seatback in the second row of the Jeep.




**Figure 3. Inspection photographs of the 2011 Jeep Grand Cherokee.**




James Walker, Esquire
December 11, 2020
Page 7



 

**Figure 4. Inspection photographs of the interior of the 2011 Jeep Grand Cherokee.**

The right front seat belt had clear evidence of loading during the subject incident and was jammed in the extended position. There was also evidence of dynamic loading on the right front latchplate loading slot. The right front seat belt was jammed in the extended position, measuring 62 inches from the outboard lap belt exit on the seat bottom to the D-ring.

*Accident Reconstruction Analysis:*

Dr. Daniel Wolfe, Ph.D. of ARCCA, Inc. conducted an accident reconstruction analysis of the subject crash. Dr. Wolfe found that the subject Jeep left the roadway and impacted an embankment, resulting in a frontal delta-V of 15.5 mph. Per the Crash Data Recorder data, both occupants were seat belted and the seat belt pretensioners fired at this point. The torsion bar in the right front seat belt may have payed out slack during this impact as well. The frontal airbags did not fire. The Jeep then launched upward and arced through the air, after which the front end contacted the ground and underwent a delta-V of less than 16 mph. No frontal airbags deployed during the second impact. The seat belt torsion bar for Mr. Manley payed out slack during this impact.

The Jeep then became airborne again and rolled in an end-over-end manner, impacting the ground a third time along the rear end of the vehicle and undergoing a delta-V of approximately 25 mph. The driver and right front seat backs collapsed at this point. The active head restraint failed to deploy for both the driver and Harold Manley in the right front seat. The direction of force was both rearward and slightly leftward as the seat backs are twisted counterclockwise when viewed from above. The vehicle then continued to roll in an end-over-end fashion and the front of the vehicle impacted the ground twice more with a delta-V of less than 16 mph both times before coming to rest in the original direction of travel.

*Crashworthiness and Front Passenger Seatback:*

Mr. Michael Markushewski performed a crashworthiness investigation of the subject incident. Mr. Markushewski determined that the inertial load applied by Mr. Manley's body during the rear-end impact phase of the accident caused seat back design failure and the corresponding inboard biased distortion and deformation. This failure resulted in the seat back rotating rearward and downward, providing no substantive support or restraint to Mr. Manley's rearward movement. In combination with the excessive seat belt slack, Mr. Manley's rearward movement continued in a nearly uninhibited fashion as he ramped over the seat back until he interacted with the second row seat back. Mr. Markushewski opined that a safe and effective alternative design was readily available at the time of manufacture of the subject 2011 Jeep Grand Cherokee which would not have collapsed and would prevent ramping during the subject mishap.

James Walker, Esquire
December 11, 2020
Page 8



*Kinematic Analyses:*

Harold Manley's response (kinematics) within the subject Jeep during the subject incident was evaluated using the laws of physics and analyses of various collision scenarios, crash tests, and sled tests. At the time of the subject incident, Harold Manley was 87 years old, 68 inches tall, and weighed approximately 191.5 pounds.

When the Jeep left the roadway, it first contacted the grassy median and underwent a longitudinal delta-V of approximately 15.5 mph. As a result, Mr. Manley would have moved primarily forward relative to the vehicle's interior.[8] Mr. Manley's forward motion was limited and controlled by the seat belt with restraint forces dispersed to the strong bony elements of his body including his right clavicle, torso, and pelvis.[9] Geometric measurements taken during the surrogate fit check demonstrate that Mr. Manley had sufficient clearances to prevent significant and injurious contact as a result of his body contacting any interior components of the vehicle.[10,11]

The subject Jeep then became airborne and traveled in an arc approximately 100 to 110 feet, at which point the front end of the Jeep then impacted the ground, resulting in a delta-V of less than 16 mph. Mr. Manley would have moved primarily forward and upward relative to the vehicle's interior during this impact.[12] Mr. Manley's forward and upward motion was limited and controlled by the seat belt with restraint forces dispersed to the strong bony elements of his body, including his right clavicle, torso, and pelvis.[13] Geometric measurements taken during the surrogate fit check demonstrate that Mr. Manley had sufficient clearances to prevent significant and injurious contact as a result of his body contacting any interior components of the vehicle, even with pay out of the seat belt via the torsion bar.[14,15] The right front passenger airbag failed to deploy during this impact. Had it done so, then it would have provided additional protection and further limited the kinematics of Mr. Manley during this impact.

As the front of the Jeep impacted the ground, the vehicle was also rotating in an end-over-end fashion. This would result in accelerations that would tend to move Mr. Manley forward and upward with respect to the interior of the vehicle.

The subject Jeep then contacted the ground a third time in a primarily rearward direction and underwent a delta-V of approximately 25 mph. Newton's Third Law of Motion dictates that the rear-end impact caused primarily rearward deceleration of the subject Jeep. Mr. Manley would have moved primarily rearward in response to these collision forces.[16,17] Inspection of the subject

---

[8]  Chandler, R.F., and Christian, R.A. (1970). Crash Testing of Humans in Automobile Seats (SAE 700361). Society of Automotive Engineers. Warrendale, PA.
[9]  Federal Motor Vehicle Safety Standard Title 49 Part 571 Section 209.
[10] Araszewski, M., Roenitz, E., and Toor, A. (1999). Maximum Head Displacement of Vehicle Occupants Restrained by Lap and Torso Seat Belts in Frontal Impacts (SAE 1999-01-0443). Society of Automotive Engineers. Warrendale, PA.
[11] Araszewski, M., Toor, A., Happer, A. (2001). Knee and Hip Displacements of Vehicle Occupants Restrained by Seat Belts in Frontal Impacts (SAE 2001-01-0180). Society of Automotive Engineers. Warrendale, PA.
[12] Chandler, R.F., and Christian, R.A. (1970). Crash Testing of Humans in Automobile Seats (SAE 700361). Society of Automotive Engineers. Warrendale, PA.
[13] Federal Motor Vehicle Safety Standard Title 49 Part 571 Section 209.
[14] Araszewski, M., Roenitz, E., and Toor, A. (1999). Maximum Head Displacement of Vehicle Occupants Restrained by Lap and Torso Seat Belts in Frontal Impacts (SAE 1999-01-0443). Society of Automotive Engineers. Warrendale, PA.
[15] Araszewski, M., Toor, A., Happer, A. (2001). Knee and Hip Displacements of Vehicle Occupants Restrained by Seat Belts in Frontal Impacts (SAE 2001-01-0180). Society of Automotive Engineers. Warrendale, PA.
[16] Yoganandan, N., Pintar, F.A., Stemper, B.D., et al. (2000). "Biomechanics of Human Occupants in Simulated Rear Crashes: Documentation of Neck Injuries and Comparison of Injury Criteria." Stapp Car Crash Journal 44: 189-204.
[17] Atarod, M. (2020). Occupant Dynamics during Moderate-to-High Speed Rear-End Collisions (SAE 2020-01-0516). Society of Automotive Engineers. Warrendale, PA.

James Walker, Esquire
December 11, 2020
Page 9



Jeep and removal and detrim of the right front passenger seat demonstrated that the seat displayed damage and distortion from collapse of the seat during the crash. The seat was twisted when viewed from above with greater deformation on the inboard side compared to the outboard side of the seat back.

Seat testing conducted by Mr. Markushewski with an exemplar 2011 Jeep Grand Cherokee driver seat and a body block demonstrated that when an approximately 1880 pound load was applied through the body block in a horizontal manner, the seat back collapsed and deformed rearward. The body block ramped upward and rearward away from the shoulder harness and the head restraint was forcibly pulled out of the seat back. The body block then ramped completely over and off the seat. This testing is consistent with the physical evidence documented by ARCCA during the vehicle inspection.



**Figure 5. Image snapshots from the seat testing of a 2011 Jeep Grand Cherokee driver seat.**

A surrogate fit check analysis was conducted with an exemplar 2012 Jeep Grand Cherokee (substantially similar to the subject 2011 Jeep Grand Cherokee), and a male surrogate that was 69 inches tall and weighed 185 pounds. The surrogate fit analysis was utilized to further investigate Mr. Manley's kinematics during the incident. While reclining the right front passenger seat rearward, the surrogate was directed to load rearward into the seatback in a ramping motion consistent with the physical evidence and ARCCA's seat testing. The surrogate then moved rearward over the top of the seat until contacting the second row seatback. This is consistent with ARCCA's inspection of the 2nd row seat backs and the documentation of impact evidence to the seat back structures. These data indicate that as a direct result of the combination of the seatback failure and excessive slack in the seat belt within the subject Jeep Grand Cherokee, Mr. Manley experienced an unsupported and uncontrolled rearward response that caused a secondary impact against the second row seatback. Provided an alternative design that eliminated the seatback failure and excessive seat belt slack and sufficiently controlled rearward excursion, Mr. Manley would have maintained a relatively upright posture thereby eliminating any substantial secondary interaction against the second row seatback.[18,19,20,21]

---

[18] Severy, D.M., Brinnk, H.M., and Baird, J.D. (1968). Backrest and Head Restraint Design for Rear-End Collision Protection (SAE 680079). Society of Automotive Engineers. Warrendale, PA.

James Walker, Esquire
December 11, 2020
Page 10





**Figure 6. Photographs from the surrogate fit check demonstrating the occupant's line of travel during the rear-impact phase of the subject crash.**

The subject Jeep then continued to rotate in an end-over-end manner as it became airborne again and traveled approximately 80 to 85 feet. Mr. Manley would have moved rearward and upward relative to the interior of the vehicle. The front of the vehicle then contacted the ground and the vehicle underwent a delta-V of less than 15 mph. Mr. Manley would have tended to move forward and downward during this phase. Having ramped rearward and impacted the 2nd row seat backs during the previous ground impact, Mr. Manley would not be afforded the protection of the lap/shoulder seat belt at this time, although it is likely his lower extremities interacted with the lap portion of the seatbelt. The subject Jeep then became airborne again and traveled approximately 35 to 40 feet, after which the front of the vehicle impacted the ground again at a delta-V of less than 15 mph. Mr. Manley would again move forward and downward relative to the interior of the vehicle.

---

[19] Eiband, A.M. (1959). "Human Tolerance to Rapidly Applied Accelerations: A Summary of Literature." National Aeronautics and Space Administration (NASA) Memorandum 5-19-59E.
[20] Romilly, D.P., and Skipper, C.S. (2005). Seat Structural Design Choices and the Effect on Occupant Injury Potential in Rear End Collisions (SAE 2005-01-1294). Society of Automotive Engineers. Warrendale, PA.
[21] Melvin, J.W., Baron, K.J., Little, W.C., et al. (1996). Investigation of Indy Car Crashes Using Impact Recorders (SAE 962522). Society of Automotive Engineers. Warrendale, PA.

James Walker, Esquire
December 11, 2020
Page 11



*Discussion:*

From a biomechanical perspective, the relationship, or lack thereof, between an event and an injury is determined by the presence or absence of an injury mechanism.[22] An injury mechanism is the fundamental mechanical process that leads to tissue failure or biomechanical failure.[23] The presence or absence of an injury mechanism was addressed by answering two critical questions:

1. Did the subject incident load the body in a <u>manner</u> known to damage the body part?
2. Did the subject incident load the body with sufficient <u>magnitude</u> to exceed the tolerance or strength of the body part?

If loads were applied in the proper manner and with sufficient magnitude to exceed the tolerance or strength of a body part, then an injury mechanism was present and causation between the subject incident and the injury cannot be ruled out. If an injury mechanism was not present (i.e. a load was not applied in the proper manner and/or with sufficient magnitude), then causation between the subject incident and the injury cannot be established.

Mr. Manley was diagnosed with an open basal skull fracture (BSF) per the responding EMT. Among Mr. Manley's physical symptoms were a left periorbital ecchymosis (unilateral blepharohematoma or raccoon eye) and brain matter coming from his nose (cerebrospinal fluid rhinorrhea). These are two of the most common symptoms associated with a BSF with unilateral blepharohematoma having a 90% positive predictive value.[24] The injury mechanisms for BSFs can include impact to the side, back, or top of the head, as well as to the face or jaw.[25,26] When an impact occurs to the top of the head, the head can become compressed between the impact surface and the neck resulting in basilar ring fractures. A 3 inch linear laceration was noted on the top of Mr. Manley's head that extended from the crown of his scalp into the right parietal scalp.

As described previously, the subject Jeep initially underwent a frontal impact and deceleration as it left the roadway and then became airborne. The Jeep then underwent another frontal impact as it contacted the ground and the rear end rotated forward. Dr. Wolfe determined that these impacts involved a delta-V of 15.5 mph and less than 16 mph, respectively. Mr. Manley would have moved primarily forward relative to the Jeep's interior during the frontal impacts with the ground. The lack of any significant head contact with interior components of the vehicle would indicate that the primary head forces of the impacts would have been inertial in nature. Scientific research demonstrates that, provided the lack of contact, Mr. Manley's head response would have been insufficient to create the injury mechanism responsible for significant head and skull injuries during the subject incident.

The surrogate fit study was performed to investigate the geometric relationships between the interior components of the vehicle and an occupant with similar anthropometry to Mr. Manley located in the right front seat. Results demonstrated that Mr. Manley would have had more than 24 inches of clearance from his head to the dashboard and approximately 4.25 inches to the interior roof. Engineering analyses conducted in accordance with peer-reviewed and generally-accepted methodologies demonstrated that the aforementioned clearance was sufficient to

---

[22] Whiting, W.C. and Zernicke, R.F. (1998). Biomechanics of Musculoskeletal Injury. Champaign, Human Kinetics.
[23] King, A.I., (2000) "Fundamentals of Impact Biomechanics: Part I – Biomechanics of the Head, Neck, and Thorax." Annual Reviews in Biomedical Engineering, 2: 55-81.
[24] Pretto Flores, L, et al (2000). Positive Predictive Values of Selected Clinical Signs Associated with Skull Base Fractures. J Neurosurg. Sci, 44(2):77-82.
[25] Sances, A. et al (1986). Spinal Injuries with Vertical Impact. Mechanisms of Head and Spine Trauma.
[26] Nahum, AM and Melvin, JW. (2002) Accidental Injury: Biomechanics and Prevention. Springer Science.

James Walker, Esquire
December 11, 2020
Page 12



prevent Mr. Manley from contacting his head on frontal interior structures during the frontal impact phases of the crash.[27,28] This is consistent with the lack of substantial facial and frontal head injuries to Mr. Manley.

There was no documentation of significant trauma or injuries to Mr. Manley's chest or torso. The Medical Examiner's report stated that there were no significant injuries of the trunk and blood could not be aspirated from either chest. This indicates that there was not substantial loading to Mr. Manley's torso via the shoulder portion of the seat belt, which is consistent with the frontal delta-V's determined by Dr. Wolfe.

As described previously, Mr. Manley moved rearward in response to the rear-end impact with the ground.[29,30] Mr. Markushewski's analysis in this matter indicated that within the relevant dynamic environment, the inertial load of Mr. Manley's body was sufficient to cause seat back failure and the corresponding inboard biased distortion and deformation. This failure resulted in the seat back rotating rearward and downward, providing no substantive support or restraint to Mr. Manley's rearward movement. In combination with the excessive seat belt slack, Mr. Manley's rearward movement continued in a nearly uninhibited fashion until he interacted with the second row seat back.[31]

The injury mechanisms responsible for Mr. Manley's head injuries dictate that he experienced a secondary impact to the top of his head against the second row seatback. The surrogate fit analysis provides a demonstrative depiction of these kinematics in the context of the seatback design failure. Had the right front passenger seat in the subject Jeep not failed in combination with the excessive seat belt slack and allowed Mr. Manley to ramp rearward and contact the 2nd row seat back, then he would not have sustained the head/skull injuries. An anthropometric regression that accounted for Mr. Manley's age, height, and weight indicated that he had a normal seated height of approximately 34.3 inches.[32] Rear-end crash testing and scientific research demonstrates that the static geometry of the head restraint within the subject Jeep Grand Cherokee would have offered support to Mr. Manley's rearward movement.[33,34,35] The right front passenger seat was equipped with an Active Head Restraint (AHR) that failed to deploy during the crash. Had the AHR deployed as designed, then the rearward movement of Mr. Manley's head would have been restrained to an even greater degree.

An occupant in a seat that experiences a rear-end impact similar to that of the subject incident without seat back failure would not be exposed to the injury mechanism required for a basilar skull fracture or other severe injuries. Researchers evaluated a compilation of anthropomorphic

---

[27] Araszewski, M., Roenitz, E., Toor, A., (1999). Maximum Head Displacement of Vehicle Occupants Restrained by Lap and Torso Seat Belts in Frontal Impacts (SAE 1999-01-0443). Warrendale, PA, Society of Automotive Engineers.
[28] Araszewski, M., Toor, A., Happer, A.J., (2001). Knee and Hip Displacements of Vehicle Occupants Restrained by Seatbelts in Frontal Impacts (SAE 2001-01-0180). Warrendale, PA, Society of Automotive Engineers.
[29] Yoganandan, N., Pintar, F.A., Stemper, B.D., et al. (2000). "Biomechanics of Human Occupants in Simulated Rear Crashes: Documentation of Neck Injuries and Comparison of Injury Criteria." Stapp Car Crash Journal 44: 189-204.
[30] National Highway Traffic Safety Administration (NHTSA). (2000). "Safety Compliance Testing for FMVSS 301, Fuel System Integrity." 2000 Ford Focus 4-door Sedan. Report No. 301-CAL-00-12.
[31] Viano, D.C., Parenteau, C.S., Prasad, P., et al. (2008). Occupant Responses in High-Speed Rear Crashes: Analysis of Government-Sponsored Tests (SAE 2008-01-0188). Society of Automotive Engineers. Warrendale, PA.
[32] U.S. Department of Health and Human Services, Centers for Disease Control and Prevention (2009). "Anthropometric Reference Data for Children and Adults: United States, 1988-1994." Vital and Health Statistics 11(249): 1-68.
[33] Farmer, C.M., Zuby, D.S., Wells, J.K, and Hellinga, L.A. (2008). "Relationship of Dynamic Seat Ratings to Real-World Neck Injury Rates." Traffic Injury Prevention 9(6): 561-567.
[34] Mertz, H.J., and Patrick, L.M. (1967). Investigation of the Kinematics and Kinetics of Whiplash (SAE 670919). Society of Automotive Engineers. Warrendale, PA.
[35] Insurance Institute for Highway Safety (IIHS). (2011). "Head Restraints & Seats." 2011 Jeep Grand Cherokee.



test device responses from FMVSS 301-type rear impact tests.[36,37] For NCAP, Mobility, and 1995+ 301 tests, both head injury criteria (HIC) and peak head acceleration were below injury assessment reference values (IARV) and the results indicated that there was a low risk for serious injury (MAIS 3) in delta-V's below 30 mph.[38] The largest upper neck response for tension was 24.6 percent of the established IARV. Offset Deformable Barrier (OBD) rear impact tests involved an average delta-V of 27 mph. In this testing, many cases involved intruding rear structures that limited or stopped seatback rotation. There was no intrusion into the occupant space of the subject Jeep. The normalized HIC response was 98 percent of the IARV and head acceleration was less than 80 percent. The IARVs in this case represent a less than 5 percent chance of injury for the head and neck. The study found that the majority of tests with responses above IARVs involved head impacts with the 2nd row seatback while it was supported by intrusion of rear structures. Additionally, only three tests had upper neck compression or tension forces above IARVs and these were vehicles with the shortest length. Research also has shown that NASS-CDS data indicates a risk of only 0.26 percent for MAIS 4+ injury in 20-25 mph rear delta-V crashes. These data demonstrate that a seat back that does not fail in combination with a seat belt system that does not pay out excessive slack will not produce the injury mechanisms required to generate the head injuries sustained by Mr. Manley when involved in a rear-end impact of similar severity to the subject incident.[39,40]

Researchers have also investigated the propensity of serious brain trauma without head impact using real-world field data.[41] McLean performed an analysis of over 400 real-world fatal incidents involving pedestrians, bicyclists, motorcyclists, and vehicle occupants. Autopsies were conducted and used to identify the presence or absence of head impact. 86 percent of the cases involved some level of brain injury. There were no instances of brain injury without evidence of head impact. Yoganandan et al.[42] conducted similar research using the motor vehicle Crash Injury Research Engineering Network (CIREN) database. The study identified instances of adult occupants sustaining severe DBI during numerous motor vehicle collisions including rear-end events. The rear-end crashes evaluated involved head impact. These results underscore the concept that severe brain trauma requires an impact condition to generate the responsible loading characteristics. Zhang et al.[43] compared head response data from automotive crash tests involving head impacts and non-head impact conditions. Automotive crash tests involving head impacts substantially increased all of the head kinematics, kinetics, and injury metrics quantified including underlying brain strains. The authors concluded that head impact conditions produced a high probability of severe brain trauma. The authors also suggested that the ultimate goal of preventing brain trauma during a motor vehicle crash should be to implement safety devices that eliminate or mitigate direct head contact. Mr. Markushewski's alternative safety design would have kept Mr. Manley effectively restrained and positioned in the right front seat during the

---

36  Viano, D.C., Parenteau, C.S., Prasad, P., et al. (2008). Occupant Responses in High-Speed Rear Crashes: Analysis of Government-Sponsored Tests (SAE 2008-01-0188). Society of Automotive Engineers. Warrendale, PA.
37  Atarod, M. (2020). Occupant Dynamics during Moderate-to-High Speed Rear-End Collisions (SAE 2020-01-0516). Society of Automotive Engineers. Warrendale, PA.
38  Mertz, H.J. and Irwin, A.L. (2003). "Biomechanical and Scaling Bases for Frontal and Side Impact Injury Assessment Reference Values. Stapp Car Crash Journal. 47:155-188.
39  Pintar FA, Yoganandan N, Voo L. (1998) Effect of age and loading rate on human cervical spine injury threshold. SPINE. Vol. 23;18:1957-1962
40  Yamada H. (1970) Strength of Biological Materials. Baltimore: Williams and Wilkins
41  McLean, A.J. (1995). "Brain Injury without Head Impact?" J Neurotrauma 12(4): 621-625.
42  Yoganandan, N., Gennarelli, T.A., Zhang, J., et al. (2009). "Association of Contact Loading in Diffuse Axonal Injuries from Motor Vehicle Crashes." J Trauma 66: 309-315.
43  Zhang, J., Yoganandan, N., Pintar, F.A., et al. (2007). "Biomechanical Differences Between Contact and Non-Contact Head Impacts in Vehicle Crash Tests." Proceedings of the Enhanced Safety of Vehicles Conference. Paper Number 07-0352.

James Walker, Esquire
December 11, 2020
Page 14



entirety of the incident. This would have prevented the fatal head contact with the second row seat backs.

Mr. Manley's son, Paul Manley, was the restrained driver of the subject Jeep. Inspection and analysis of the driver's lap/shoulder seat belt indicates that the seat belt webbing became wedged in the latch plate and D-ring, preventing any pay out of the seat belt. Mr. Manley did not sustain any serious or severe injuries as a result of the incident. This demonstrates that a restrained occupant in the subject Jeep who did not ramp rearward would not sustain significant contact with any interior components of the vehicle and would not be likely to sustain significant injuries.

The physical evidence in this matter demonstrates that Mr. Manley ramped rearward up and over the right front seat back and head restraint and subsequently impacted the second row seat backs and head restraints in the subject Jeep. The abrasions and evidence of occupant interaction on the rear seats are consistent with Mr. Manley's head contacting the seat back after the ramping event. This would result in impact forces to Mr. Manley's head and skull which would be consistent with the injury mechanism required for a basilar skull fracture.

The Jeep then started to pitch forward as it went airborne again for approximately 80 to 85 feet. The rear end of the Jeep then impacted the ground and the vehicle underwent a Delta-V of less than 15 mph. The Jeep then became airborne again and the front end impacted the ground with another delta-V of less than 15 mph. Prior to these impacts, Mr. Manley had already ramped rearward over the right front seat back and impacted the 2nd row seat backs with his head due to the seat collapse and excessive slack in the seat belt. Mr. Manley's pelvis and torso would not have been restrained by the seat belt during these impacts and he would have moved forward and downward relative to the interior of the Jeep. There is no indication that Mr. Manley contacted the forward interior aspect of the subject Jeep with significant force during these events. However, had Mr. Manley and the right front seat remained in an upright position with an effective restraint system, then his subsequent kinematics and loading to his head/neck would have been well controlled and limited during these events.

The need to design effective occupant protection systems to avoid injury during a motor vehicle collision has been well established in the scientific community.[44] More specifically, the seat back and seat belt work in conjunction to not only absorb energy, but, more importantly, control the rearward excursion of front seat occupants.[45,46,47] The right front passenger seat back and seat belt within the subject Jeep failed to perform this intended function and Mr. Manley experienced an impact to the top of his head via the second row seat backs. This secondary impact created the injury mechanisms responsible for Mr. Manley's head injuries. Mr. Markushewski identified an alternative design that would have prevented the seat back and seat belt failures and the aforementioned secondary impact, thereby preventing Mr. Manley's critical injuries.[48,49,50,51]

---

44  Nahum, A.M., and Melvin, J.W. (2002). Accidental Injury: Biomechanics and Prevention, Second Edition. Springer, New York.
45  Severy, D.M., Brinnk, H.M., and Baird, J.D. (1968). Backrest and Head Restraint Design for Rear-End Collision Protection (SAE 680079). Society of Automotive Engineers. Warrendale, PA.
46  Romilly, D.P., and Skipper, C.S. (2005). Seat Structural Design Choices and the Effect on Occupant Injury Potential in Rear End Collisions (SAE 2005-01-1294). Society of Automotive Engineers. Warrendale, PA.
47  Thomson, R.W., Romilly, D.P., Navin, F.P.D., et al. (1993). Dynamic Requirements of Automobile Seatbacks (SAE 930349). Society of Automotive Engineers. Warrendale, PA.
48  Severy, D.M., Brinnk, H.M., and Baird, J.D. (1968). Backrest and Head Restraint Design for Rear-End Collision Protection (SAE 680079). Society of Automotive Engineers. Warrendale, PA.
49  Eiband, A.M. (1959). "Human Tolerance to Rapidly Applied Accelerations: A Summary of Literature." National Aeronautics and Space Administration (NASA) Memorandum 5-19-59E.

James Walker, Esquire
December 11, 2020
Page 15



**Conclusions:**

Based upon a reasonable degree of biomechanical and scientific certainty, I conclude the following:

1. On February 16, 2017, Mr. Harold Manley was the seat belted right front passenger in a 2011 Jeep Grand Cherokee being driven by Mr. Paul Manley. The subject Jeep left the roadway and impacted an embankment after which it launched upward. The front of the Jeep then impacted the ground and proceeded to roll in an end-over-end manner, resulting in a subsequent impact between the rear of the vehicle and the ground. The Jeep then continued its roll and the front of the vehicle impacted the ground again followed by another impact between the right front of the vehicle and the ground, after which the Jeep came to rest.

2. The inertial load of Mr. Manley's body caused the right front seat back to collapse during the rear-end impact with the ground. This collapse and the excessive slack in the seat belt resulted in Mr. Manley ramping up and over the seat until he interacted with the second row seatbacks.

3. The injury mechanisms responsible for Mr. Manley's head injuries dictate that he experienced a secondary impact to the top of his head against the second row seatback. Mr. Manley's response to this secondary impact was sufficient to generate the injury mechanisms responsible for his fatal injuries. Therefore, the seat back failure and excessive slack in the seat belt was the mechanism for Mr. Manley's fatal injuries.

4. The seatback within the subject Jeep Grand Cherokee failed to perform the intended function and Mr. Manley experienced a secondary impact that ultimately generated the injury mechanisms responsible for his fatal injuries. An alternative design that prevented the ramping and aforementioned secondary impact, would have prevented Mr. Manley's fatal injuries.

If you have any questions, require additional assistance, or if any additional information becomes available, please do not hesitate to call.

Sincerely,

Andrew J. Rentschler, Ph.D.

---

50  Romilly, D.P., and Skipper, C.S. (2005). Seat Structural Design Choices and the Effect on Occupant Injury Potential in Rear End Collisions (SAE 2005-01-1294). Society of Automotive Engineers. Warrendale, PA.
51  Melvin, J.W., Baron, K.J., Little, W.C., et al. (1996). Investigation of Indy Car Crashes Using Impact Recorders (SAE 962522). Society of Automotive Engineers. Warrendale, PA.