UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| Richard Manley, Individually, and Paul Manley, Individually and as a Representative of the Estate of Harold Manley Jr., | § § § § § | |
| Plaintiffs, | § § | Civil Case No.    4:19-cv-123-ALM |
| vs. | § § § | |
| FCA US, LLC, | § § § | |
| Defendant. | § | JURY |

**PLAINTIFF'S MOTION TO EXCLUDE THE TESTIMONY OF DEFENDANT'S RETAINED EXPERT TOM LIVERNOIS**

Plaintiff files this Motion to Exclude the Testimony of Defendant's Retained Expert Tom Livernois ("Livernois"). Livernois inaccurately speculates, without offering relevant and competent supporting evidence, that some undefined cause other than the subject vehicle's throttle control system must have caused the vehicle to accelerate prior to the crash at issue. Livernois's opinions should be excluded for the reasons described below.

    **I.  FACTUAL AND PROCEDURAL BACKGROUND**

It is undisputed that Paul Manley purchased the 2011 Jeep Grand Cherokee involved in the wreck in early 2011 when it had fourteen (14) miles on it. (Ex. A). It is undisputed that Paul is the one and only owner of the vehicle. Defendant manufactured the vehicle. Prior to the February 16, 2017 incident, the Jeep had three separate sudden acceleration events that prompted Paul to take it in for throttle body service. (Ex B, C, D, E).

This product liability case arose after multiple safety systems in the Jeep failed on February 16, 2017, when the Jeep accelerated off the paved roadway and rolled end-over-

end for reasons the severely injured driver Paul Manley could not articulate. Front passenger Harold Manley Jr. died as a result of seat design defects and his son Paul Manley suffered severe injuries in the driver's seat. A factual dispute as to why the Jeep suddenly accelerated off the paved roadway exists.

Defendant, through its retained expert Lisa Gwin, claims the vehicle accelerated off the road because a seizure caused Paul's foot to apply steady pressure to the gas pedal. But Paul's vehicle maintenance records show the Jeep had a history of sudden acceleration and Paul took the Jeep in to *three* different Chrysler dealerships on three separate occasions to address the Jeep's sudden acceleration issues caused by the Jeep's throttle body system. (Ex B, C, D, E). Each time, as Paul will testify, technicians had to work on the throttle body system to address the sudden acceleration issue, but each time the sudden acceleration issue later re-emerged. *Id.* at 2.

Exhibit B - Allen Samuels Chrysler Dodge Jeep Ram:

```
           ****************************************************
G THROTTLE BODY SERVICE
    TBS THROTTLE BODY SERVICE
        379 ALLBRITTON,BILL LIC#: 4514
            CPM                                                  96.00    96.00
    1  117  B12                                         6.95     6.95     6.95
  37053 1.0 LABOR/THROTTLE BODY SERVICE COMPLETE/RELEARN ETC/QC
           ****************************************************
```

Exhibit C - Clay Cooley Chrysler Dodge Jeep Ram:

| Inspection Recommendations | Status | Cost |
|---|---|---|
| Perform fuel injection service (Found throttle body to be dirty) | Fail | $199.95 |

Exhibit D - AutoNation Chrysler Dodge Jeep Ram:

```
                  ************************************************
    E 1402/THROTTLE BODY SVC $89.95[PARTS 6.95, LABOR 83.00, 0.8]
       1402 1402/THROTTLE BODY SVC $89.95[PARTS 6.95,
              LABOR 83.00, 0.8]
          7581 WANDRO,JOHN LIC#: 9928
                 CD                                    83.00      83.00
       1 117 B12                               6.95     6.95       6.95
    PARTS:    6.95  LABOR:   83.00  OTHER:    0.00  TOTAL LINE E: 89.95
     56957 0.8 TK 7581, COMPLETED AT CUSTOMER REQUEST
                  ************************************************
```

It is undisputed that the CDR Report recording the subject vehicle accident shows the *engine throttle* position steadily rose to a peak of 99% during the accident while the *foot pedal accelerator* position only rose to 93%. (Ex. E at pg. 2.).

## II. ARGUMENT AND LEGAL AUTHORITIES

"The burden is on the proponent of the expert testimony to establish its admissibility by a preponderance of the evidence." *Orthoflex, Inc. v. ThermoTek, Inc.*, 986 F. Supp. 2d 776, 783 (N.D. Tex. 2013) (citations omitted). More specifically, "[t]he court may admit proffered expert testimony only if the proponent, who bears the burden of proof, demonstrates that (1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the evidence is reliable." *Id.* Defendant is unable to satisfy its burden on these requirements for Livernois's testimony.

### B. Livernois is unqualified to opine on the mechanical issues.

Livernois is not a mechanical engineer, he is a specialist in electrical engineering. (Ex. F at pg. 23). Livernois's opinions regarding electrical sensors and electrical systems are irrelevant and are not at issue; this case is about a mechanical throttle body acceleration. Livernois is unqualified to give his only real relevant opinion:

> If the throttle valve somehow became stuck or unable to open/close for any reason, including soot or debris build-up, the diagnostic system would detect and mitigate the situation such that no unintended acceleration would occur.

(Ex. F at pg. 4). Livernois's lack of mechanical expertise on this topic explains his inability to provide any supporting evidence other than generalized speculation about "common reasons for unintended acceleration" to prop up his unsubstantiated, inaccurate opinion that a throttle body defect was not the cause of the sudden acceleration on February 16, 2017. (Ex. F at pg. 4). Electrical engineer Livernois dove deep into the waters of mechanical engineering, without a life preserver, and his opinion won't swim.

**B.     Livernois's opinions are not relevant or reliable.**

Livernois states "the throttle position sensors ("TPS") provide position data used by the PCM to monitor the actual throttle valve position" and argues "Soot or debris on and/or around the throttle valve does not affect the function of the throttle position sensors" to claim the throttle *valve* could not have malfunctioned because the *sensors* were clean. (Ex. F at pg. 3-4). Simply put, Livernois makes the conclusory claim that if the sensors monitoring the throttle body were in working order, the throttle body itself couldn't malfunction. Livernois assumes, without offering any evidence or explanation, "If the throttle valve somehow became stuck or unable to open/close for any reason, including soot or debris build-up, the diagnostic system would detect and *mitigate the situation*." (Ex. F at pg. 4 (emphasis added)). But Livernois never explains *how* the *diagnostic* system would "mitigate" a stuck throttle valve or how any of the unidentified diagnostic mitigation efforts would overcome the powerful acceleration inputs coursing through the stuck throttle valve. Livernois merely provides the conclusory opinion that if the stuck throttle valve is detected by a sensor, it is corrected simply by the fact that it was detected by the sensor. (Ex. F at pg. 3-4, 5) (stating "the diagnostic system would detect the issue and mitigate the risk of unintended vehicle acceleration" without explaining *how* the "*diagnostic* system"

would "*mitigate the risk*") (emphasis added).

Livernois also makes the all-or-nothing, binary argument that if the throttle body software malfunctioned, the malfunction would necessarily be confined to the throttle body software alone and would not encompass any other components, because otherwise "the engine would not operate correctly." (Ex. F at pg. 5). Certainly the "engine did not operate correctly" when the fourth, fatal sudden acceleration occurred. But Livernois's claim that it is impossible for the vehicle to continue to accelerate if the throttle body is malfunctioning is belied by the three sudden acceleration diagnoses that preceded the fourth, fatal sudden acceleration. *See* Ex B, C, D, E and *cf*. Ex. F at pg. 5.

Livernois cites a May 14, 2015 NHTSA Denial of a Petition for Defect Investigation of a *2006-2010 Toyota Corolla* to speculate that the NHTSA's Toyota Corolla Denial "sees no factual basis for assigning any level of probability to the proposed software defects" in the 2011 Chrysler Jeep Grand Cherokee at issue here. *See* Ex G, H and *cf*. Ex F at pg 5-6. Using a defect described in the 2006-2010 Toyota Corolla to analyze the defect in the 2011 Jeep Grand Cherokee is "junk science." Livernois's opinion is irrelevant and unreliable. Notably, Livernois fails to disclose or address his misuse of the Toyota Corolla ODI Report containing the wrong manufacturer, make, model and year vehicle for this case in his Jeep Grand Cherokee retained expert report.

Livernois cites his inspection of an "exemplar vehicle", not the actual vehicle at issue, to argue, "No issues were found." (Ex F at pp. 6-9). Livernois's inspection of "an exemplar vehicle" throttle body system is irrelevant to the issue of whether the throttle body system in the *actual* vehicle in the crash malfunctioned, and his opinion is unreliable. Livernois is never able to articulate how comparing an *exemplar* vehicle that may or may not have latent sudden acceleration issues but certainly has a different use and maintenance

history advances his theory that the *subject* vehicle did not have a defective throttle body.

Livernois speculates, without offering any evidence, that "The throttle body assembly service is: cleaning the throttle plate of dirt build up." (Ex F at pg. 9). Livernois's speculation that the "throttle body assembly service" performed by the maintenance personnel for three different dealerships (Clay Cooley, Allen Samuels, and AutoNation) on three different occasions was confined to "cleaning the throttle plate of dirt build up" is unreliable. *See* Ex B, C, D, E and *cf*. Ex. F at pg. 9. Livernois also ignores the throttle body service records to make the fallacious claim that there is "no verifiable abnormal vehicle performance prior to the crash." (Ex. F at pg. 14).

Livernois focuses on the vehicle software throughout his report but then excludes 11 of 15 NHTSA reports documenting sudden acceleration issues with the justification that "Only four of these complaints pertain to Jeep Grand Cherokee vehicles equipped with the 5.7L V8 ETC system." (Ex. F at pg. 14). Either Livernois's focus on the *software* is a red herring, or Livernois's exclusion of 11 of the 15 NHTSA reports because those vehicles did not have a 5.7L V8 *engine* is evidence of his unreliable methodology. This selective analysis is particularly troubling given Livernois's willingness to rely on a 2006-2010 Toyota Corolla NHTSA report to bolster his opinion. (Ex. F at pg. 5-6).

Livernois further claims that since drivers in 3 out of his 4 cherry picked (from 15) incidents applied the brakes at some point during the sudden acceleration malfunction, those incidents are dissimilar enough to exclude them from his analysis of whether the throttle body malfunctioned. (Ex. F at pg. 15). Livernois's "brake application" excuse is a red herring. The issue is acceleration, not braking. Likewise, "the check engine light coming on and the transmission downshifting while merging onto the highway" are both irrelevant to whether the throttle body malfunctioned. (Ex. F at pg. 15). Livernois

concludes that the throttle body was not the culprit in these events because "pedal misapplication and driver error/inattention" are "plausible explanations for reported unintended acceleration events" and argues "drivers frequently do not understand how certain vehicle systems operate." (Ex. F at pg. 15-16).  These conclusory opinions are speculative and unreliable.  Livernois merely proffers what he repeatedly describes as a "plausible" argument that something – anything – other than the vehicle's throttle body may have been the culprit in these sudden acceleration mishaps.  (Ex. F at pg. 15, 16, 18).

### III.   CONCLUSION AND REQUEST FOR RELIEF

For these reasons, Plaintiff respectfully asks the Court to grant this motion in its entirety, enter an Order excluding Tom Livernois's testimony in this case, and for any other relief to which Plaintiff is justly entitled.

Respectfully submitted,

/s/ James Walker
James "Jim" Walker
Jim Walker & Associates, PLLC
Texas State Bar No. 24042111
4925 Greenville Ave., Suite 200
Dallas, TX 75206
Telephone: (214) 227-9812
Facsimile: (972) 434-3052
Jim@jimwlaw.com

Heather Lynn Long
State Bar No. 24055865
HEATHER LONG LAW PC
4310 N Central Expressway
Dallas, Texas 75206
Telephone: 214-699-5994
Facsimile: 877-755-9766
heather@heatherlonglaw.com

ATTORNEYS FOR PLAINTIFFS.

## CERTIFICATE OF CONFERENCE

I hereby certify pursuant to Local Rule CV-7(i) that on May 28, 2021 counsel complied with the "meet and confer" requirement of Local Rule CV-7(h) and the motion is opposed.

*/s/ James "Jim" Walker*
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on May 28, 2021, a copy of the above and foregoing was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing has been forwarded to all counsel of record by operation of the Court's electronic filing system and email.

*/s/ James "Jim" Walker*
Attorney for Plaintiff
